UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CYNTHIA BENDER,**

     Plaintiff,

**v.**                           **Case No.: 8:04-CV-1929-T-23EAJ**

**CITY OF CLEARWATER,**

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     This cause comes on for consideration of **Defendant's Motion for Summary Judgment** and **Plaintiff's Response to Defendants' Motion for Summary Judgment**.  (Dkts. 21 and 30)[1]

     On August 23, 2004, Plaintiff Cynthia Bender ("Plaintiff") filed a three-count complaint against Defendant, the City of Clearwater ("the City"), alleging violations of the Family Medical Leave Act ("FMLA") and Title VII of the Civil Rights Act of 1964 ("Title VII").  (Dkt. 2) Specifically, Plaintiff charges that the City interfered with, and retaliated against her for exercising, her rights under the FMLA.  (Dkt. 2, ¶¶ 17, 21)  In addition, Plaintiff alleges that the City retaliated against her in violation of Title VII for reporting alleged sexual harassment and filing a complaint against the City.  (Dkt. 2, ¶¶ 25-27)

## I.    BACKGROUND FACTS

     Plaintiff, a manager in the HR Department, worked in the Human Resources ("HR") Department of the City for twenty-three years.  (Dkt. 30 at 1)  As the benefits manager and a non-

---

[1] This matter has been referred to the undersigned by the district judge for consideration and a Report and Recommendation.  See Local Rules 6.01(b) and 6.01 (c), M.D. Fla. (Dkt. 34)

voting member of the City's Benefit Committee, Plaintiff's responsibilities included making recommendations on vendors that are permitted to do business with the City, including companies that sell insurance to the City.  (Dkt. 22-2 at 29-31)

Beginning in 2002, Plaintiff alleges that Joseph Roseto ("Roseto"), another manager in the HR Department, made comments to her including: (1) how Plaintiff and other female HR Staff were attractive; (2) how "easy" it would be to have an affair at work; (3) when Roseto was in the Army, he had opportunities to have affairs but did not; and (4) discussions about his sex life with his wife.  (Dkt. 22-2 at 76, 102)  Specifically, Plaintiff alleges that Roseto told her several times that he had been married for a long time, that he like sex to be very lively, and that he did not want "just boring, plain sex."  (Id. at 102)  According to Plaintiff, Roseto made these comments behind closed doors and not in the presence of other staff.  (Id. at 76, 102)  To discourage Roseto's alleged comments, Plaintiff stated that she went to the ladies' room or walked away.  (Id. 79-80)  Plaintiff also testified that Roseto never asked her out on a date and never directly told her that he wanted to have an affair with her.  (Id. at 82-83)

In April 2002, Plaintiff informed Paul O'Rourke ("O'Rourke"), the HR Director and Plaintiff's supervisor, about Roseto's alleged comments.  (Dkt. 22-2 at 80)  Plaintiff told O'Rourke that Roseto's comments made her uncomfortable and that she did not want to have that type of conversation with Roseto.  (Id.)  O'Rourke did not conduct an investigation of Plaintiff's claim but made an initial assessment that Roseto made the comments to Plaintiff because Roseto had made similar comments to O'Rourke.  (Dkt. 22-10 at 71)

In May 2002, O'Rourke spoke briefly to Roseto about his alleged comments to Plaintiff. (Dkt. 22-10 at 73-74)  O'Rourke believed the alleged comments were offensive to Plaintiff and told

Roseto to cease and desist from such conversations.  (Id. at 71-73)  When asked if O'Rourke disciplined Roseto regarding his alleged comments, Plaintiff testified that Roseto's conduct had not "risen to the level that needed to have formal discipline."  (Dkt. 22-2 at 94)

Roseto denies making any inappropriate sexual comments to Plaintiff.  (Dkt. 31-14, bate stamp number 000556)

 Neither O'Rourke or Plaintiff reported the alleged comments to the Equity Services Department, the department which investigates complaints of harassment.  (Dkt. 21 at 2; Dkt. 22-2 at 99; Dkt. 22-10 at 70)

After O'Rourke spoke to Roseto, Plaintiff testified that Roseto temporarily stopped making offensive comments to her.  (Dkt. 22-2 at 81)  Plaintiff contends that Roseto resumed his offensive comments to her during the summer of 2002.  (Id.)

In May 2002, O'Rourke resigned from his position with the City.  (Dkt. 30 at 3; Dkt. 33-2 at 13-14)  Upon O'Rourke's departure, Rick Ebelke became the acting HR Director.  (Dkt. 21 at 2-3) In August 2002, Sue Wiesing ("Wiesing") was appointed as the City's HR Director.  (Dkt. 30 at 3) During Wiesing's brief tenure as HR Director, Plaintiff did not complain to Wiesing about Roseto's alleged comments.  (Dkt. 22-2 at 84)

In September 2002, Plaintiff attended a course on insurance law.  (Dkt. 22-2 at 84, 87, 98) Wiesing approved Plaintiff's enrollment in the insurance law course.  (Dkt. 22-2 at 84-85)

A.  Plaintiff's Allegations of Retaliation

In September 2002, Roseto became the City's HR Director and Plaintiff's direct supervisor. (Dkt. 22-2 at 75)  Plaintiff alleges that after Roseto's promotion to HR Director in September 2002, Roseto began to retaliate against her for not maintaining a personal relationship with him.  (Dkt. 22-

3

2 at 96-97, 100, 136-37)  From September 2002 to March 2003, Roseto allegedly demanded that Plaintiff have a personal relationship with him or she would not "survive in the organization." (Dkt. 30 at 3; Dkt. 22-2 at 96-97)  Plaintiff alleges that Roseto was very angry at her for not having a friendship with him.  (Id.)

Sometime between September 2002 and February 2003, Plaintiff contends that Roseto threatened her employment regarding her potential testimony in a lawsuit against the City (referred to as the "Pearn-Mehr case").  (Dkt. 22-2 at 103-104)  Plaintiff contends she disagreed with the City's decision to terminate police officers in the Pearn-Mehr case; Roseto allegedly told her it would be to her advantage to testify in support of management's position.  (Dkt. 22-2 at 108)  Plaintiff did not testify or talk to the attorney representing the City in the lawsuit.  (Id. at 108)

Plaintiff also claims that Roseto retaliated against her for meeting with O'Rourke after O'Rourke left the City's employment. (Dkt. 30 at 4; Dkt. 22-2 at 126)  In October 2002, the City held an open enrollment meeting for City employees to hear about benefits available to them.  (Dkt. 22-2 at 116)  Plaintiff alleges that O'Rourke attended the October 2002 open enrollment meeting to learn about his COBRA rights.  (Id.) In November 2002, Plaintiff contends that she met with O'Rourke outside of the office to discuss his 401(a) benefits.  (Id. at 126-28)

Defendant maintains that Roseto counseled Plaintiff about inviting O'Rourke to the October 2002 open enrollment meeting because O'Rourke was affiliated with AFLAC. (Dkt. 21 at 4; Dkt. 22-6 at 45)  Defendant further contends that while Roseto never instructed Plaintiff not to see O'Rourke, Roseto advised Plaintiff "to use some discretion" because it could appear that she was divulging confidential information to O'Rourke.  (Dkt. 21 at 6; Dkt. 22-6 at 19-20)

According to Plaintiff, another example of Roseto's retaliation was his criticism in February

4

or March 2003 regarding Plaintiff's attendance at work-related association meetings.  (Dkt. 22-2 at 111-14)  Plaintiff also contends that Roseto accused her of being disloyal when she raised concerns about senior management in the City's fire department.  (Id. at 126)

With the exception of Plaintiff's April 2002 conversation with O'Rourke regarding Roseto's alleged sexual harassment, Plaintiff did not discuss Roseto's alleged sexual harassment or retaliation with City officials.[2]  (Dkt. 22-2 at 83-84)

B.  Plaintiff's Outside Employment

In December 2002, Plaintiff applied for permission with the City to work as an independent insurance agent.  (Dkt. 31-2 at 2)  Her application indicated that she would be "selling insurance products to clients" and devoting approximately fifteen to twenty hours to this outside employment.  (Id.)

On December 17, 2002, Roseto approved the request and forwarded Plaintiff's request for outside employment to Assistant City Manager Garrison Brumback ("Brumback") and the City's Legal Department for their approvals.  (Id. at 1)

In January 2003, Plaintiff took three vacation days to attend an AFLAC training program.  (Dkt. 22-2 at 23)

In February 2003, Plaintiff was appointed by AFLAC to sell policies.  (Dkt. 22-2 at 20-21)  Roseto testified that he told Plaintiff that she should not have a business relationship with any City

---

[2]  Plaintiff alleges that she spoke to Leslie Dougall-Sides ("Dougall-Sides") regarding Roseto's anger and hostility towards her.  (Dkt. 22-2 at 49-52)  Nevertheless, Plaintiff testified that she did not complain to Dougall-Sides about any alleged sexual harassment or retaliation by Roseto.  (Id. at 135-36)

vendors and that he believed selling AFLAC insurance was a conflict of interest.[3]  (Dkt. 22-6 at 25)  Although Plaintiff did not agree with Roseto's interpretation that her outside work with AFLAC was a conflict of interest, Plaintiff contends she followed Roseto's order and did not sell insurance for AFLAC until after she was terminated by the City.[4]  (Dkt. 30 at 9; Dkt. 22-2 at 37-39, 125-26)

In April 2003, while on FMLA leave, Plaintiff obtained product information from an AFLAC office.  (Dkt. 22-2 at 40)

In response to an inquiry by Roseto, by letter of April 14, 2003, AFLAC advised Roseto that: (1) Plaintiff was an agent licensed to sell insurance products in the state of Florida; (2) she had been appointed as an agent for the receipt of applications for AFLAC insurance products in the state of Florida; and (3) she would not receive any commissions from any policy sold to individuals employed by the City.  (Dkt. 31-7)  The letter provided in pertinent part that: "I wish to stress this final point.  Although Ms. Plaintiff has been appointed to sell AFLAC products and had attended various training courses provided by AFLAC, she will not at any time receive commissions from individuals employed by the City of Clearwater."  (Id.)

C.      Plaintiff's Performance Evaluations

On January 8, 2003, Plaintiff received a performance evaluation from the City.  (Dkt. 31-3)

---

[3]  Section 2.304(1)(A) of the City's ethic code provides in relevant part that:

No city officer or city employee shall accept or solicit anything of value, including a gift, loan, reward, present, business relationship, or promise of future employment from any person or business entity which is interested directly or indirectly in any transaction with the city.  (Dkt. 21 at 5)

[4]  Plaintiff disputes that Roseto told her not to establish a business relationship with any City vendor.  (Dkt. 30 at 8)  However, Plaintiff does acknowledge that Roseto advised Plaintiff that he believed selling AFLAC insurance was a conflict of interest.  (Dkt. 30 at 9)

During the review period of January 1, 2002 through December 31, 2002, Plaintiff either exceeded expectations or met expectations on key job objections. (Id.) Her performance summary reads in part: "Cynthia has done an outstanding job. She has dealt with, and continues to deal with, some very challenging issues such as health care and employee discipline. She is a key member of the HR staff." (Id. at 4) Plaintiff's January 2003 performance evaluation did not raise any issues of poor performance, untrustworthiness, unethical behavior or misappropriation of funds. (Id.) Roseto, as Plaintiff's supervisor, signed Plaintiff's performance evaluation. (Id. at 5)

On March 10, 2003, Defendant alleges that Roseto talked to Plaintiff about his concerns with her performance and the conflict of interest presented by her business relationship with ALFAC. (Dkt. 22-7)

On March 11, 2003, Roseto sent Plaintiff an email asking Plaintiff to meet with him "this evening or sometime tomorrow" to follow up "our discussions of yesterday." (Dkt. 22-7) Roseto's email to Plaintiff states: "I have prepared a memorandum laying out what we discussed and I will give you a copy of that at our meeting." (Dkt. 22-7 at 1)

In Roseto's March 11, 2003 memorandum, Roseto raised the following concerns regarding Plaintiff's performance, including: (1) Plaintiff's invitation to O'Rourke to attend an open enrollment meeting in December 2002; (2) Plaintiff's possible conflict of interest created by her outside employment; (3) Plaintiff's violation of his specific direction to avoid a conflict of interest with AFLAC by attending a training session on AFLAC insurance; (4) Plaintiff's failure to complete assignments; (5) Plaintiff's time away from the office on job related business; and, (6) Plaintiff's excessive non-job related conversations on her personal cell phone. (Dkt. 22-7 at 2-4) As a result of Roseto's concerns, Roseto concluded that Plaintiff would not be permitted to use her personal cell

phone in the office and the City's approval of her outside work was rescinded.  (Id. at 4)  In his memorandum, Roseto asked Plaintiff to "[p]lease evaluate my comments and concerns and provide me with your perspective as to how we will resolve these issues."  (Id.)

Because Plaintiff began FMLA leave effective March 12, 2003, Plaintiff did not receive a copy of Roseto's March 11, 2003 memorandum or meet with Roseto on March 12, 2003 as he requested in the email.[5]  (Dkt. 30 at 11; Dkt. 22-6 at 64-65)  Plaintiff maintains that there were no steps taken to terminate her until after she took FMLA leave and after she filed a sexual harassment claim against the City.  (Dkt. 30 at 16-19)

D.  Plaintiff's FMLA Leave

In September 2002, Plaintiff began treatment with a licensed mental health counselor allegedly due to Roseto's alleged threatening and demeaning behavior.  (Dkt. 22-2 at 146)

Plaintiff went on FMLA leave effective March 12, 2003.  (Dkt. 22-2 at 67)  On March 13, 2003, Joseph C. Shanklin, M.D. ("Dr. Shanklin"), Plaintiff's treating physician, signed a medical excuse supporting Plaintiff's FMLA leave request.  (Dkt. 31-5)  Dr. Shanklin recommended that Plaintiff be excused from work from March 12, 2003 to April 23, 2003.  (Id.)  As a result of the hostile work environment created by Roseto, Plaintiff contends she suffered from anxiety and depression.  (Dkt. 22-2 at 67)  On April 9, 2003, Roseto sent Plaintiff a letter stating that the City could not process her FMLA paperwork without a second medical opinion.  (Dkt. 31-6)  Roseto stated that Plaintiff was required to submit all documentation on standard City forms and enclosed a standard City Medical Release form.  (Id.)  In his letter, Roseto requested that Plaintiff return the

---

[5]  It is unclear from the record whether Plaintiff submitted a request for FMLA prior to March 12, 2003.

completed form on or before April 16, 2003.  (Id.)

On April 16, 2003, Plaintiff resubmitted the Medical Release form to Roseto.  (Dkt. 31-8)
Plaintiff explained the resubmitted form was the same form she previously provided to the City with
her leave request.  (Id.)  On both forms, Plaintiff added language stating that she only authorized the
release of information which is outlined in the FMLA.  (Id.)

On April 22, 2003, Dr. Shanklin, signed a certification which stated that Plaintiff should not
work and the probable duration of her condition was June 1, 2003.  (Dkt. 31-9)

On May 9, 2003, M.K. El-Yousef, M.D. ("Dr. El-Yousef") submitted a second opinion on
Plaintiff's condition.  (Dkt. 31-10)  Dr. El-Yousef's opinion concluded that Plaintiff "is unable to
resume her duties in the workplace she has been in due to depression and anxiety being treated since
September 2002.  Some pressures in the workplace environment are not manageable for her in the
present clinical state."  (Id.)

After receiving the second medical opinion from Dr. El-Yousef, Roseto approved Plaintiff's
request for FMLA leave on May 14, 2003.  (Dkt. 31-12)  In the May 14, 2003 letter, Roseto noted
that her "12 weeks of FMLA leave will end on June 3, 2003."  (Id.)  Roseto also added that "[t]hose
issues which were pending as of the time you left for FMLA, as well as additional concerns which
have since arisen, will be held in abeyance until the conclusion of your twelve week FMLA period."
(Id.)

According to City policy, employees on FMLA leave must use their paid sick leave and
vacation leave concurrently with the FMLA.  (Dkt. 21 at 7; Dkt. 22-6 at 72)  Plaintiff was paid her
regular salary for the entire twelve (12) weeks of FMLA leave.  (Dkt. 22-2 at 66)

E.       Plaintiff's Allegations of Retaliation After She Requested FMLA Leave

During Plaintiff's FMLA leave, Plaintiff alleges that Roseto retaliated against her.  (Dkt. 30 at 4)  Plaintiff alleges that Roseto removed Plaintiff's access to the City email and directed a City employee to go to Plaintiff's home to obtain Plaintiff's laptop computer.  (Dkt. 22-2 at 53-55; Dkt. 22-6 at 54-55)  By taking away her laptop computer and restricting her access to her email, Plaintiff alleges that the City's actions prevented her from maintaining contact with her staff and staying apprised of projects so, that when she was able to return to work, she could resume functioning as a manager. (Dkt. 22-2 at 53-54)

Plaintiff asserts that Roseto advised other employees that they were forbidden from having contact with Plaintiff while she was on FMLA.  (Dkt. 22-2 at 56-58)  Further, Plaintiff alleges that Roseto told other employees that she was out for unethical reasons instead of medical leave.  (Id.) Plaintiff testified that Roseto discussed her medical condition with unauthorized people.  (Id. at 56, 60-62)  Plaintiff also contends that Roseto delayed the processing of her claim forms submitted to HR for her car payment, for which she maintained disability coverage.  (Id. at 64-70)

On May 14, 2003, while Plaintiff was on FMLA leave, her attorney sent a letter to the City lodging an official complaint for sexual harassment regarding Roseto's actions.  (Dkt. 31-13)  The City's Equity Services Department conducted an investigation into Plaintiff's complaint.[6]  (Dkt. 30 at 6)

_____

[6] Plaintiff argues that this court should not consider the affidavit of Eleanor Breland, which includes a copy of the City's sexual harassment investigation and employee statements regarding Plaintiff's sexual harassment claim against Roseto, because the affidavit contains conclusions regarding the investigation and hearsay statements.  (Dkt. 30 at 6)  An employee is not required to prove that the employer's behavior constituted sexual harassment in order to recover for retaliation. Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001).  Rather, an employee must show that she subjectively believed her employer was engaged in unlawful employment practices and that her belief was objectively reasonable in light of the facts and record presented.  Id.  Thus, for purposes of this motion, it is unnecessary to consider this affidavit or the contents of the City's investigation.

Plaintiff alleges that "[o]n June 4, 2003, the day my FMLA expired, I left a voice message for Human Resources Director, Joseph Roseto, to advise him that my doctor did not feel I was capable of returning to my employment at the City and that I was going to extend my absence, utilizing my accrued sick leave."[7]  (Dkt. 22-2 at 73-74; Dkt. 32-6) Plaintiff asserts that she advised Roseto she would present him with a doctor's note confirming her inability to return to work.  (Dkt. 32-6)

Plaintiff alleges that, prior to her termination, Dr. Shanklin certified to the insurance company that she was disabled.  (Dkt. 22-2 at 73-74)  Further, Plaintiff contends that it was a routine practice to allow City employees who had taken 12 weeks of FMLA leave to extend their absences with available sick leave.  (Dkt. 33 at 94; Dkt. 32-6 at 1)

F.     Plaintiff's Termination

On June 5, 2003, two days after her FMLA leave had elapsed, Plaintiff was terminated. (Dkt. 31-15)  The June 4, 2003 letter from Brumback to Plaintiff provided:

> I hereby notify you that your employment is terminated effective June 5, 2003, at the end of the day.  As an at-will probationary employee, there is no right of appeal of this decision.

(Id.)

City Manager William Horne ("Horne") and Brumback made the decision to terminate Plaintiff, with legal consultation from Akin.  (Dkt. 30 at 6; Dkt. 22-5 at 4-5)  The discussions by City officials regarding Plaintiff's termination occurred approximately a week before her termination. (Dkt. 22-5 at 6; Dkt. 22-6 at 36-37)

On March 12, 2004, Plaintiff filed a formal complaint with the EEOC alleging sexual

_____

[7] It is unclear from the record whether Plaintiff had accrued sick leave at the expiration of her FMLA leave.

harassment and retaliation by Roseto and the City.[8]  (Dkt. 2)

After Plaintiff filed a complaint with the EEOC, Roseto, Horne and Brumback signed written statements regarding the grounds for Plaintiff's termination.  (Dkt. 31-16; Dkt. 32-2; Dkt. 32-3; Dkt. 2 at 1)  In a memorandum dated April 5, 2004, Roseto wrote that "[w]hen I became aware of Ms. Bender's outside employment activities and misappropriation of City funds I considered her actions a serious violation of City policy."  (Dkt. 31-16)  In light of her significant responsibilities, Roseto concluded that Plaintiff's "actions called into question her ability to successfully continue in that role."  (Id.)  Further, Roseto noted that after he informed Brumback and Horne of his concerns, the City Manager "felt the breach of trust was compelling and that termination may be appropriate." (Id.)

In a memorandum, dated April 6, 2004, Horne wrote in pertinent part:

> It was brought to my attention that Ms. Bender has been performing the duties of her position in an unethical and untrustworthy manner. As City Manager, it was my determination that since Ms. Bender could not be trusted she could not continue with the City in her position as Human Resources Manager and, as a contract employee working at the pleasure of the City Manager, should be terminated.

(Dkt. 32-3)  Explaining the grounds for Plaintiff's dismissal, Brumback stated that "[w]hen it was brought to the attention of the City Manager's office that Ms. Bender had been performing her duties unethically, the City Manager determined that Ms. Bender, as an at-will employee, should be terminated."  (Dkt. 32-2)

During discovery in this matter, Roseto, Horne and Brumback were questioned about Plaintiff's termination.  Roseto testified that City funds should not have been used for Plaintiff's enrollment in an insurance class.  (Dkt. 22-6 at 30)  Roseto believed it was a misappropriation of

---

[8] Plaintiff also alleges she filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") in September 2003.  (Dkt. 22-15, Interrogatory Answer No. 7)

City funds for Plaintiff to attend the insurance course in October 2002.  (Id.)

According to Horne's deposition testimony, Plaintiff was terminated because "there was a lack of trust and lack of performance."  (Dkt. 22-9 at 16-18)  Specifically, Horner testified that Plaintiff was not performing her responsibilities and Plaintiff's involvement with O'Rourke in the October 2002 open enrollment meeting was inappropriate and exhibited poor judgment.  (Id. at 17-18)  Horne made his decision to terminate Plaintiff based upon information provided to him from the City's Human Resources Department.  (Id. at 15)

Brumback testified that the major reason Plaintiff was dismissed was that Plaintiff was asked not to work with AFLAC by Roseto and she continued to do so, breaching "the fundamental trust we had in her."  (Dkt. 22-5 at 8-9)  Further, Brumback stated that he terminated Plaintiff because of her performance, breach of trust, and failure to follow instructions.  (Id. at 13-14)  In deciding to terminate Plaintiff, Brumback did not confer with Plaintiff and relied upon information from Roseto about Plaintiff's actions.  (Id. at 10)

In reference to Plaintiff's decision to bring O'Rourke to the October 2002 open enrollment meeting, Brumback stated that although Plaintiff's decision was inappropriate, Plaintiff was not terminated for bringing O'Rourke to the meeting.  (Id. at 16.)  Brumback testified that Plaintiff's association with O'Rourke resulted in Brumback questioning Plaintiff's judgment.  (Id. at 17)

As legal counsel to the City, Akin testified that she consulted with Horne and Brumback regarding the decision to terminate Plaintiff.  (Dkt. 22-8 at 4-5)  Akin stated that Plaintiff's performance issues were the primary reason for her dismissal.  (Id. at 14, 16)  In addition, Akin asserted that she, Horne and Brumback also considered the fact that Plaintiff failed to return to work after the expiration of her FMLA leave, Plaintiff's outside employment, Plaintiff's failure to follow Roseto's directive regarding her outside employment, and the incident involving O'Rourke.  (Id. at

6, 13-14)

After the EEOC issued a Notification of Right to Sue letter on May 18, 2005, Plaintiff filed a complaint against the City in the Circuit Court of the Sixth Judicial Circuit for Pinellas County, Florida.  (Dkt. 1 at 1; Dkt. 2 at 1)  On August 23, 2004, Plaintiff's complaint was removed from state court to this court.  (Dkt. 1)

## II.    DISCUSSION

### A.  The Parties' Contentions

Defendant contends that Plaintiff cannot sustain her interference claim under the FMLA because Plaintiff requested FMLA leave and the City granted her twelve weeks of FMLA leave. Defendant asserts that Plaintiff was terminated for the following reasons: (1) her poor performance; (2) a conflict of interest she created by having a business relationship with a City vendor;  (3) inappropriately bring O'Rourke to a City event; (4) her untrustworthiness; and (5) Plaintiff's failure to return to work at the expiration of her FMLA leave.  As such, Defendant argues that Plaintiff's termination was unrelated to the exercise of her FMLA rights and that there is no merit to Plaintiff's FMLA interference claim.

Regarding Plaintiff's FMLA retaliation claim,  Defendant argues that, except for her termination, Plaintiff cannot establish an adverse employment action.  Because the City terminated Plaintiff for legitimate reasons, Defendant argues that there is no causal connection between her termination and the exercise of her FMLA rights.  Moreover, Defendant contends that because the City terminated Plaintiff for nondiscriminatory reasons, Plaintiff cannot demonstrate that her termination was a pretext for discrimination.  Even assuming that the other conduct Plaintiff complains of constituted an adverse action, Defendant asserts that the City's actions were motivated by a good faith belief that the Plaintiff was untrustworthy due to her improper business relationship

with AFLAC.

Finally, Defendant argues that Plaintiff cannot prevail on her retaliation claim under Title VII.  Because Plaintiff cannot prove that any adverse employment action she may have suffered was causally related to her exercise of any protected activity, Defendant argues that this court should grant summary judgment in favor of Defendant.

In opposition to Defendant's motion, Plaintiff argues that the City, through Roseto, interfered with her FMLA rights by engaging in multiple dilatory and obstructive steps in processing her FMLA leave.  Additionally, Plaintiff contends the City violated her rights under the FMLA by failing to reinstate her to her former position.  In reference to her retaliation claim, Plaintiff asserts that after she took FMLA leave, the City delayed processing and approving her leave, engaged in other adverse actions against her and subsequently terminated her.

Plaintiff argues that summary judgment should not be granted on her Title VII claim because she has established a prima facie case of retaliation.  According to Plaintiff, after she complained about Roseto's inappropriate sexual comments and filed an sexual harassment claim with the City, Roseto engaged in such oppressive and demeaning behavior that she suffered negative changes in her work status.  Plaintiff notes that two weeks after her attorney filed a sexual harassment complaint on her behalf, she was terminated.  Given the close proximity between the filing of her complaint and her termination, Plaintiff contends she has raised an inference of causation sufficient to preclude the granting of Defendant's summary judgment motion.  Moreover, Plaintiff argues that the City's proffered reasons for her termination were a mere pretext for her dismissal, and that the City's inconsistent reasons for her dismissal are evidence of this pretext.

B. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56©), Fed. R. Civ. P. See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating to the court that it has met this standard. 477 U.S. at 323. Under Rule 56(e), Fed. R. Civ. P., once the movant has met this burden, the nonmoving party must identify specific facts that raise a genuine issue for trial. Id. at 324.

The court may not decide a genuine factual dispute in ruling on a motion for summary judgment, but rather must decide if material factual issues are present. Fernandez v. Bankers National Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990)(citations omitted). The court must judge all evidence in the light most favorable to Plaintiff as the nonmoving party, and all justifiable inferences must be drawn in the Plaintiff's favor. Id. However, the evidence must also be viewed within the scope of the evidentiary burden of the respective parties under the substantive law of the case. Fernandez, 906 F.2d at 564, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If, under this standard, the evidence can be considered such that a reasonable jury could find for the plaintiff, summary judgment is inappropriate. Fernandez, 906 F.2d at 564, citing Celotex, 477 U.S. at 324. A mere scintilla of evidence supporting the nonmoving party's position will not suffice to demonstrate a material issue of genuine fact that precludes summary judgment. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

C. Family Medical Leave Act

The FMLA, enacted in 1993, was intended to strike a balance between the protection of the American worker and the development of an effective workforce. 29 U.S.C. § 2601 et. seq. The FMLA entitles an employee to take up to 12 workweeks of leave in any twelve-month period

16

because of a serious health condition.  29 U.S.C. § 2612(a)(1)©).

Pursuant to the statute, when leave is foreseeable, the employee shall give an employer not less than 30 days notice before the leave is to begin.  29 U.S.C. § 2612(e)(1).  If leave is not foreseeable, the employee shall provide such notice as is practicable.  Id.

The statute further provides that an employee may elect, or an employer may require the employee to substitute any of the accrued paid vacation, personal leave for any part of the 12-week period of FMLA leave.  29 U.S.C. § 2612(d)(2)(A) and (B).  When an employee returns from FMLA leave in a timely fashion, an employee is entitled to be reinstated to her former position, or an equivalent one.  29 U.S.C. § 2614(a)(1).  Interfering with, restraining or denying an employee's exercise of rights under the statute is unlawful.  29 U.S.C. § 2615(a)(1).

There are two types of claims cognizable under the FMLA: interference claims, in which the employer burdens or denies substantive statutory rights to which their employee is entitled, and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave. 29 U.S.C. § 2615(a)(1) and (2); see also O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir. 2000).[9]  Plaintiff alleges both claims in her complaint.

───────────────────

[9]  Although the FMLA does not label these two claims as "interference" or "retaliation," courts have used these terms in describing an employee's claim under the statute.  See O'Connor, 200 F.3d at 1352.    The statute provides in relevant part:

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.  29 U.S.C. §

D.      Plaintiff's FMLA Interference Claim

Generally, to establish an interference claim, an employee must show that he was denied an available benefit under the FMLA or was not allowed to return to his position following the exercise of FMLA leave.  29 U.S.C. § 2614(a)(1); Strickland v. Water Works and Sewer Bd. Of City of Birmingham, 239 F.3d 1199, 1208 (11th Cir. 2001).  The FMLA does not define "interference," but regulations define it as not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. 29 C.F.R. § 825.220(b).  See Liu v. Amway Corp., 347 F.3d 1125, 1134 (9th Cir. 2003)(employer interfered with the length and dates of FMLA leave); Mardis v. Central Nat'l Bank & Trust, No. 98-6056, 1999 U.S. App. LEXIS 7261 *8 (April 15, 1999 10th Cir.)(threatening employee with loss of accrued vacation as a condition for taking FMLA leave raises an interference claim).

To state a claim of interference, an employee need only demonstrate by a preponderance of the evidence that he was denied  a right or employee benefit.[10]  Hurlbert v. St. Mary's health Care Sys., Inc., No. 05-10252, 2006 U.S. App. LEXIS 3733 * 16-17 (Feb. 16, 2006 11th Cir.) citing Strickland, 239 F.3d at 1207.  When an employee alleges a deprivation of substantive guarantees under FMLA, the issue is whether the employee is due the right or benefit, regardless of the intent of the employer.  Id.

Plaintiff claims that the City violated her FMLA rights by engaging in dilatory and obstructive steps in processing and approving her FMLA leave.  Specifically, Plaintiff alleges that

---

2615(a)(1) and (2).

[10]  The term "employee benefits" means all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions, regardless of  whether such benefits are provided by a practice or written policy of an employer or through an employee benefit plan.  29 U.S.C. § 2611(5).

Roseto delayed approving her FMLA request by requiring her to resubmit her leave form and by delaying the ordering of a second medical opinion.  According to Plaintiff, the City's actions were "the very reason it was necessary" for Plaintiff to extend her time beyond the FMLA leave.  (Dkt. 30 at 13)  While not entirely clear from Plaintiff's brief, it appears that Plaintiff is arguing that the City's intentional delays violated the statute thereby entitling her to an extension of her FMLA leave and reinstatement.

Adopting Plaintiff's argument that the City's alleged delays justify an extension of her FMLA leave would amount to an impermissible windfall to Plaintiff.  Ragsdale v. Wolverine World Wide Inc., 535 U.S. 81, 94 (2003)(employer's failure to advise employee that an employee's 30 week absence would count against her FMLA leave did not allow employee to take additional weeks of FMLA leave).  An employee may not manipulate the start date of her FMLA leave because it would effectively permit the employee to unilaterally amend the statute to allow a leave of absence in excess of the 12 weeks.  Johnson v. Morehouse College, 199 F. Supp. 2d 1345, 1357 (N.D. Ga. 2002).  Indeed, the FMLA provides for only 12 weeks of leave and does not suggest that the 12 weeks of leave may be extended.  Ragsdale, 535 U.S. at 96; Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 797 (11th Cir. 2000), cert. denied 532 U.S. 1037 (2001); McGregor v. Autozone, 180 F.3d 1305, 1308 (11th Cir. 1999); Johnson, 199 F. Supp. 2d at 1357.

Significantly, Plaintiff has not shown that the City's alleged delays in processing and approving her leave resulted in a denial of a right or benefit.  It is undisputed that Plaintiff requested and was granted 12 weeks of FMLA leave.  The City approved her request for FMLA leave on May 14, 2003,[11] noting that her 12 weeks of FMLA leave was effective on March 12, 2003 and ended on

---

[11]  The court notes that part of the delay in approving Plaintiff's leave request was due to the City's requirement that Plaintiff submit to a second medical opinion.  Employers may require employees to submit to a second medical opinion.  29 U.S.C. § 2613©).

June 3, 2003. Thus, Plaintiff has not established a denial of any right or benefit under the FMLA. See Myrick v. Aramark Corp., No. 02-C-5890, 2004 U.S. Dist. LEXIS 7301 *28-30 (Apr. 28, 2004 E.D. Ill.)(where employee received 12 weeks of FMLA, employer's delay in approving leave did not constitute basis for interference claim). In addition, Plaintiff has failed to demonstrate that the City violated the FMLA when it refused to reinstate Plaintiff to her former position. Where an employee is absent for more than the protected period of time, the employee does not have a right to be restored to his prior or similar position. McGregor, 180 F.3d at 1308; Johnson, 199 F. Supp. 2d at 1358-1359. The FLMA expressly states that any eligible employee who takes leave is entitled "on return from such leave," to be restored to the former or equivalent position. 29 U.S.C. § 2614(a)(1). Likewise, the Department of Labor regulations provide that an employee's right to reinstatement is premised upon the employee's timely return from FMLA leave. 29 C.F.R. § 825.214; Wilcox v. National Distributors Inc., No. 00-298-P-H, 2001 WL 877547 *4 (Aug. 2, 2001 D. Me.). When Plaintiff failed to return to work on June 4, 2003, she had no entitlement to reinstatement to her former position.

Finally, Plaintiff claims that the City interfered with her FMLA rights by seizing her computer, denying her access to her email, ordering other employees not to contact her, discussing her leave with other employees, questioning the sincerity of her absence and delaying the processing of her disability claim forms. (Dkt. 30 at 13) Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not shown that the City's alleged actions stopped her from taking FMLA leave or prevented her from returning to work at the end of her approved leave. See Dittle v. United States Postal Service, No. 04-146(PAM/RLE), 2005 U.S. Dist. Lexis 1487 * 23 (Feb. 2, 2005 D. Minn.)(court rejected interference claim because inappropriate comments by employer criticizing employee for taking FMLA leave did not have chilling effect on employee taking leave); McKinzie

v. Sprint/United Mgmt. Co., No. 03-2348-GTV, 2004 U.S. Dist. LEXIS 23417 *19 (Nov. 16, 2004

D. Kan.)(sarcastic and derogatory remarks by employer about plaintiff taking time off for FMLA

leave did not constitute an interference claim).  Therefore, as a matter of law, Plaintiff's interference

claim fails.

E.      Plaintiff's FMLA Retaliation Claim

To establish a retaliation claim, the employee must show that (1) she engaged in a protected

activity, (2) the employer discharged her or took other adverse action against her, and (3) there is

a causal link between the protected activity and the discharge.  Strickland, 239 F.3d at 1207; see also

Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000).  To prevail on a retaliation

claim, an employee must demonstrate that the employer intentionally discriminated against him in

the form of an adverse action for having exercised a right under the FMLA.  Strickland, 239 F.3d

at 1207.

If the employee establishes a causal connection existed between the events, the employer has

the burden of articulating a legitimate reason for the adverse action.  Hurlbert, 2006 U.S. App.

LEXIS 3733 * 28.  An employer can deny the right of reinstatement if it can demonstrate that it

would have discharged the employee had he not been on FMLA leave.  O'Connor, 200 F.3d at 1354.

Should the employer allege legitimate reasons for the employee's discharge, the employee must

produce evidence that the proffered reason for the adverse action is a pretext and motivated by

discriminatory animus.  Strickland, 239 F.3d at 1207.

1.      Retaliatory Termination Claim

In arguing that the City retaliated against her for taking FMLA leave, Plaintiff glosses over

the fact that she failed to return to work at the expiration of her leave and that she received all the

leave (12 weeks) to which she was entitled.  In essence, Plaintiff suggests that the City was not

permitted to terminate her because her failure to return to work was somehow excused by the City's alleged delay in processing and approving her leave.

Here, Plaintiff must show a causal connection between statutorily protected conduct, and her termination.  Plaintiff's statutorily protected conduct was her use of 12 weeks of FMLA leave.  As long as the employee has been given the requisite leave period, the statute does not forbid an employer from discharging an employee who fails to come back to work at the expiration of the leave.  Johnson, 199 F. Supp. 2d at 1360-1361.  An employee's insistence on taking more leave than is allowed by the FMLA is not protected conduct.   Johnson, 199 F. Supp. 2d at 136.  Therefore, when Plaintiff refused to return to work after the expiration of her leave, the City did not retaliate against her for exercising her rights under the statute.  Furthermore, Plaintiff has failed to offer evidence that there was a casual connection between her use of FMLA leave and her termination.  Wilcox, 2001 WL 877547 *4-5 (when employee failed to return to work after expiration of leave, there was no causal connection between use of FMLA leave and termination).  Thus, Plaintiff's FMLA retaliatory termination claim fails because Plaintiff has not established that she had engaged in a FMLA protected activity when the City terminated her and Plaintiff has not offered evidence of a causal connection between her use of FMLA leave and her termination.

2.   Plaintiff's Allegations of Other Adverse Action

Plaintiff also alleges that other conduct by the City constituted adverse employment actions for purposes of her retaliation claim.  Plaintiff alleges that, while she was on FMLA leave, Plaintiff suffered the following adverse actions: (1) the City confiscated her laptop computer, (2) the City restricted her access to email, (3) the City ostracized her by ordering other employees to have not contact with her, (4) the City discussed her medical leave with other employees, (5) the City delayed processing and approving her leave, (6) the City delayed the request for a second medical opinion,

(7) the City delayed the processing of her disability claim, and (8) the City continued to question the sincerity of her absence.

An adverse employment action is not limited to decisions to discharge an employee. Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002).  An employer's conduct short of termination may be an adverse action if such conduct reaches a threshold level of substantiality.  Id.  Thus, "while not everything that makes an employee unhappy is an adverse action, conduct that alters an employee's compensation, terms, conditions or privileges of employment does constitute adverse actions." Id. quoting, Bass v. Bd of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001).  The Eleventh Circuit emphasized that to prove an adverse employment actions, an employee must show a "serious and material change" in the terms, conditions or privileges of employment in a real and demonstrable way.  Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001).

Even assuming for the sake of argument that Plaintiff's allegations about the City's conduct are true, the City's actions do not constitute adverse actions under the FMLA.  Although Plaintiff makes vague allegations that the City's actions were insulting, demeaning and oppressive, Plaintiff fails to provide specific evidence on how the City's conduct had a tangible impact on her job.  As previously discussed, Plaintiff cannot show that any delays by the City in processing or approving her leave request seriously altered the terms, conditions or privileges of her employment.  Likewise, there is no evidence in the record to demonstrate that the City's restriction on the use of her laptop or email while she was on FMLA leave materially affected her position.  Plaintiff argues that the restriction prevented her from maintaining contact with her staff and staying apprised of projects during her leave.  Nevertheless, Plaintiff does not provide any proof that this restriction resulted in any negative consequences such as a demotion, transfer, or reassignment of duties.  Nor is there any

evidence cited by Plaintiff that her lack of contact with other workers during her leave and Roseto's discussion of her leave with other employees altered the terms, conditions or privileges of her employment.

Plaintiff has not shown that she suffered any loss in salary or benefits as a result of the City's alleged actions.  During her FMLA leave, she received her full salary and she was not demoted.  Thus, the court concludes that the City's alleged conduct did not seriously impact Plaintiff's employment in a meaningful way.  As such, Plaintiff's FMLA retaliation claim must fail.

F. Title VII Retaliation Claim

Under the opposition clause of Title VII of the Civil Rights Act of 1964, an employer may not retaliate against an employer because the employee has opposed any practice made unlawful under the statute.  42 U.S.C. § 2000e-3(a).  Under the participation clause, an employer may not retaliate against an employee because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under the statute.  Id.

In this case, Plaintiff alleges that after she complained to O'Rourke in April 2002 about Roseto's alleged sexual harassment, Roseto retaliated against her.  First, Plaintiff contends that Roseto retaliated against her for not maintaining a personal relationship with him.  (Dkt. 21 at 6) From September 2002 to March 2003, Plaintiff contends that Roseto was very angry at her for not having a personal relationship and friendship with him.  She testified that Roseto told her she would not "survive in the organization" unless she had a personal relationship with him.

Second, after she rebuffed Roseto's advances, Plaintiff contends that Roseto engaged in oppressive and demeaning behavior by: (1) threatening her employment regarding her potential testimony in a City case, (2) criticizing her for attending work related meetings, (3) accusing her of disloyalty when engaging in a work related activity, (4) insulting and demeaning her for meeting

with O'Rourke, (5) delaying the processing of her FMLA leave and disability paperwork, (6) depriving her access to email and her computer during her FMLA, (7) discussing her medical condition with unauthorized persons, (8) forbidding other employees from contacting her, (9) telling other employees that she was out for unethical reasons, (10) demanding a second medical opinion for her FMLA, (11) disputing the sincerity of her absence, and (12) investigating her relationship with AFLAC.  Plaintiff contends that Roseto's treatment was so adverse that it became impossible for her to perform her job, and therefore, she suffered significant negative changes her in work status.  Finally, Plaintiff alleges that after she rebuffed Roseto's advances, after her complaints to management about Roseto, and two weeks after her attorney filed a sexual harassment complaint with the City, she was terminated.

In its motion for summary judgment, the City argues that Plaintiff cannot establish a prima facie case for a retaliation claim under the opposition clause because she cannot establish that she engaged in statutorily protected activity.  Specifically, the City asserts that Plaintiff cannot demonstrate that she had a subjective or objective belief that she was the victim of sexual harassment.  To support of its position, the City relies upon Plaintiff's statement that she did not believe Roseto's behavior had risen to the level of formal discipline.  Considering the totality of the circumstances, the City argues that the alleged conduct was not frequent, severe or physically threatening and did not interfere with her work performance.  The City further alleges that Plaintiff's retaliation claim under the participation clause fails because Plaintiff did not file a formal charge with the EEOC before her termination.

### 1.  Plaintiff's Retaliation Claim Under the Opposition Clause

To recovery for retaliation a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there

is a causal connection between the participation in the protected activity and the adverse employment decision.  Gupta v. Florida Bd of Regents, 212 F.3d 571, 587 (11th Cir.), cert. denied, 531 U.S. 1076 (2000).  Under Title VII, Plaintiff is not required to prove that Roseto's conduct constituted sexual harassment in order to recover for retaliation.  Lipphardt, 267 F.3d at 1187; Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989).  Instead, Plaintiff is required to show a good faith reasonable belief that Roseto was engaged in unlawful employment practices and that her belief was objectively reasonable in light of the facts and record. Id.

For an employer's conduct to constitute actionable sexual harassment, it must be so objectively offensive as to alter the conditions of the victim's employment.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998).  Plaintiff must show that the harassment occurred because of her sex and that the conduct was sufficiently severe or pervasive that a reasonable person would find it hostile or abusive.  Clover v. Total System Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  To determine whether the conduct is sufficiently severe or pervasive, a court will consider the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's job performance.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246-1247 (11th Cir. 1999).  To support a Title VII retaliation claim, the alleged conduct need not actually be sexual harassment but the conduct "must be close enough to support an objectively reasonable belief that it is."  Clover, 176 F.3d at 1351.  The objective severity of the harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances.  Oncale, 523 U.S. at 81.

Plaintiff alleges that, beginning in 2002, Roseto told Plaintiff how she and other female workers were attractive, how "easy" it would be to have an affair at work, and how he had opportunities to have affairs in the Army, but did not.  In addition, Plaintiff alleges that Roseto discussed his sex life with his wife.  After Roseto's promotion in September 2002, Plaintiff alleges that Roseto demanded that she have a personal relationship with him or she would not survive in the organization.

Under the law of this Circuit, Roseto's alleged comments are not close enough to actionable sexual harassment to support an objectively reasonable belief that Plaintiff's complaint constituted statutorily protected expression.  In Gupta, the court held that employer's conduct was not severe or pervasive when the employer's conduct included telling the employee she was beautiful, calling her at home and asking if she was in bed, staring at her, repeatedly asking her to lunch, touching her jewelry, touching her on the knee, touching the hem of her skirt, and unbuttoning his pants and tucking in his shirt in her presence.  Gupta, 212 F.3d at 584-686.  In Mendoza, the court found no objective reasonable belief of sexual harassment where an employer told plaintiff, "I'm getting fired up," rubbed his hip against hers while touching her shoulder and smiling at her, made sniffing sounds while staring at her groin, and followed her constantly and stared at her.  Mendoza, 195 F.3d at 1247-48.

In contrast, a constant barrage of sexual harassment, including explicit sexual comments and physical harassment, does support an objective reasonable belief of sexual harassment.  Olson v. Lowes Home Centers, Inc., 130 Fed. Appx. 380, 388 (11th Cir. 2005)(court found conduct severe and pervasive where employer's frequent comments were sexually explicit and increasingly vulgar, employer forcibly rubbed his entire body against plaintiff on two occasions and employer kissed plaintiff); Johnson v. Booker T. Washington Broadcasting Service, 234 F.3d 501, 509 (11th Cir.

2000)(fifteen separate occasions of severe harassment, including unwanted massages, standing so close that employer's body parts touched plaintiff, rubbing employer's body parts on plaintiff, pulling up his pants and sticking out his tongue in an obscene manner, inappropriately discussing sex and asking plaintiff about her sex life); <u>Dees v. Johnson Control World Servs., Inc.</u>, 168 F.3d 417, 4122 n.12 (11th Cir. 1999)(almost daily abuse in the form of sexually explicit stories and jokes, comments about employee's body and physical harassment, including grabbing and slapping employee's buttocks, groping her leg, and touching her in a sexually suggestive manner).

In the instant case, Plaintiff's claims of harassment by Roseto are not analogous to the severe and pervasive sexual harassment allegedly experienced by employees in <u>Olson</u>, <u>Johnson</u> and <u>Dees</u>. Indeed, Plaintiff alleges fewer instances of less objectionable conduct than in the cases of <u>Gupta</u> and <u>Mendoza</u> where the court held there was no objective reasonable belief that the employer's conduct constituted sexual harassment.  Although Plaintiff may have believed Roseto's comments were inappropriate, Roseto's comments were not the type of sexually explicit or vulgar statements, jokes or stories that constitute sexual harassment.  Plus, Plaintiff does not allege a continuous onslaught of misconduct by Roseto.  Rather, she admits his comments ceased after she complained to O'Rourke in April 2002, resumed again in the summer of 2002, and then stopped in September 2002.  Nor does Plaintiff assert that Roseto ever physically threatened or harassed her by kissing, touching, grabbing or groping her.  While she contends that Roseto demanded a personal relationship with her, Plaintiff does not provide any evidence that Roseto sought a sexual relationship with her.  Plaintiff acknowledged that Roseto never asked her out on a date or ever directly told her that she wanted to have an affair with her.

Although Plaintiff may have had a bona fide belief that Roseto's comments were offensive, Plaintiff's belief that Roseto's comments were severe harassment is undermined by her testimony

that she did not believe Roseto's conduct rose to the level of formal discipline.  In April 2002, Plaintiff complained once to O'Rourke about Roseto's comments.  In May 2003, her attorney filed a sexual harassment complaint with the City. Plaintiff never reported Roseto's misconduct to the Equity Services Department or to the City's legal counsel.

Despite Plaintiff's insistence that Roseto's conduct was so severe and pervasive that it was impossible to perform her job and that she suffered significant negative changes at work, Plaintiff fails to substantiate these general claims with citations to specific evidence in the record.  This court is under no obligation to plumb the record in order to find a genuine issue of material fact.  Barge v. Anheuser-Busch, Inc., 97 F.3d 256, 260 (8th Cir. 1996); Steffen v. Senterfitt, No. 8:04-cv-1693-T-24 MSS, 2005 U.S. Dist. LEXIS 30575 *29 n. 19 (Dec. 2, 2005 M.D. Fla.)(Rule 56 does not impose a duty upon court to survey the entire record in search of evidence to support non-movant's opposition).

Plaintiff has not established a good-faith and an objective reasonable belief that Roseto's conduct constituted sexual harassment.  Therefore, she has failed to show that, by complaining of Roseto's conduct, she engaged in the sort of statutorily protected expression that Title VII protects.

In sum, the court finds that there are no facts to support a finding that Plaintiff engage in statutorily protected expression, a necessary element in proving her prima facie case of retaliation under the opposition clause of Title VII.  As such, her claim for retaliation under the opposition clause fails.[12]

---

[12]  Accordingly, because Plaintiff has failed to establish a prima facie case of Title VII retaliation, the court will not address Plaintiff's arguments that she established a causal connection between her sexual harassment complaint and the adverse employment actions or that the City's grounds for her termination were pretextual.

2. <u>Plaintiff's Retaliation Claim under the Participation Clause</u>

The participation clause covers participation in an investigation under subchapter VI of Chapter 21 of Title 42.  42 U.S.C. § 2000e-3(a).  The Title VII's participation clause does not protect absolutely every Title VII complaint made to an employer.  <u>EEOC v. Total Systems, Inc.</u>, 221 F.3d 1171, 1174 n.3 (11th Cir. 2000).  Rather, this clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC.  <u>EEOC</u>, 221 F.3d at 1174. Importantly, the participation clause does not include an employee's participation in an employer's internal, in-house investigation conducted apart from a formal charge with the EEOC.  <u>Id.</u>; <u>Byer v. Dallas Morning News, Inc.</u>, 209 F.3d 419, 428 (5th Cir. 2000)(employee failed to raise a retaliation claim under the participation clause because employee did not file charge with EEOC until after the alleged retaliatory discharge took place).

Plaintiff alleges that she was retaliated against and eventually terminated by the City based on her participation in "sexual harassment investigations."  (Dkt. 22, Ex. 15, Interrogatory Answer No. 5)  First, Plaintiff has failed to demonstrate that she participated in any sexual harassment investigation.  O'Rourke did not conduct an investigation of Plaintiff's April 2002 complaint against Roseto.  Plaintiff does not allege or present any evidence that, after her attorney filed a complaint with the City on May 14, 2003, she participated in the agency's investigation of her claim.

Second, even if the court were to assume that Plaintiff participated in an agency investigation, it is undisputed that Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") <u>after</u> her termination in June 2003.  Plaintiff alleges she filed complaints with the EEOC in September 2003 and on March 12, 2004.  To constitute protected activity under the participation clause, at a minimum, an employee must file a charge with the EEOC before the employee's termination.  <u>McShane v. Gonzales</u>, 144 Fed. Appx. 779, 789 (11th Cir.

2005), citing EEOC, 221 F.3d at 1174 n. 2.  Thus, the court concludes that, because no EEOC complaint was filed before Plaintiff's termination, any alleged participation in an investigation did not constitute protected expression under the participation clause of Title VII.

## III. CONCLUSION

It is therefore **RECOMMENDED** that:

(1)     Defendant's Motion for Summary Judgment (Dkt. 21) be **GRANTED**.


**Dated:  April 4, 2006**


ELIZABETH A JENKINS
United States Magistrate Judge


Case No. 8:04-CV-1929-T-23EAJ


### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. 636 (b)(1).